176 Cal.App.4th 51 (2009)
CALIFORNIA GROCERS ASSOCIATION, Plaintiff and Respondent,
v.
CITY OF LOS ANGELES, Defendant and Appellant;
LOS ANGELES ALLIANCE FOR A NEW ECONOMY, Intervener and Appellant.
No. B206750.
Court of Appeals of California, Second District, Division Five.
July 30, 2009.
*55 Rockard J. Delgadillo, City Attorney, Laurie Rittenberg, Assistant City Attorney, and John A. Carvalho, Deputy City Attorney, for Defendant and Appellant.
*56 Schwartz, Steinsapir, Dohrmann & Sommers and Henry M. Willis for Intervener and Appellant.
Jones Day, Richard S. Ruben, Craig E. Stewart and Nathaniel P. Garrett for Plaintiff and Respondent.

OPINION
KRIEGLER, J. 
A trade association of grocery store operators and suppliers brought an action challenging an ordinance enacted by the City of Los Angeles that required purchasers of large grocery stores to employ the prior store's workforce for 90 days. The trial court found the ordinance was preempted by the California Retail Food Code (CRFC), Health and Safety Code section 113700 et seq.,[1] based on the Legislature's express intent to fully occupy the field of health and sanitation standards for retail food facilities. Defendant City of Los Angeles (City) and intervener Los Angeles Alliance for a New Economy (LAANE) appeal from the judgment enjoining enforcement of the ordinance. The City and LAANE contend that the purpose of the ordinance is to provide job security to grocery workers in the event of a change in ownership, and the provisions are unrelated to health and sanitation standards. We conclude that the ordinance requires successor grocery employers to employ experienced workers in order to maintain health and safety standards at the store during the transition to new management. As such, the ordinance enters into a field fully occupied by state law and is preempted. In addition, we conclude that the ordinance is preempted by the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.). Therefore, we affirm.

FACTS AND PROCEDURAL BACKGROUND

The State Statutory Scheme
The CRFC is a comprehensive statutory scheme regulating health and sanitation standards for retail food facilities. The CRFC encompasses a wide range of provisions regulating food facilities, including building plan review (§ 114380), employee knowledge (§ 113947 et seq.), food storage (§ 114047 et seq.), and sanitation practices for equipment and utensils (§ 114095 et seq.).
In section 113705, the Legislature expressly declared that "the public health interest requires that there be uniform statewide health and sanitation *57 standards for retail food facilities to assure the people of this state that the food will be pure, safe, and unadulterated. Except as provided in Section 113709, it is the intent of the Legislature to occupy the whole field of health and sanitation standards for retail food facilities, and the standards set forth in this part and regulations adopted pursuant to this part shall be exclusive of all local health and sanitation standards relating to retail food facilities."
Under section 113709, local governing bodies are permitted to adopt an evaluation or grading program for food facilities, to prohibit any type of food facility, to adopt an employee health certification program, to regulate consumer toilet and handwashing facilities, and to adopt public safety requirements concerning vending from vehicles.
The CRFC contains several provisions regulating employee knowledge of food safety. Food facilities that provide nonprepackaged potentially hazardous food must have an owner or employee who has passed an accredited food safety certification examination. (§ 113947.1, subd. (a).) "A food facility that commences operation, changes ownership, or no longer has a certified owner or employee pursuant to this section shall have 60 days to comply with this subdivision." (Id., subd. (e).)
In addition to the requirements for a certified owner or employees, all food employees must have adequate knowledge and be properly trained in food safety as it relates to their assigned duties. (§ 113947.) The certified owner or employee is responsible for ensuring that all employees who handle nonprepackaged foods have "sufficient knowledge to ensure the safe preparation or service of the food, or both. The nature and extent of the knowledge that each employee is required to have may be tailored, as appropriate, to the employee's duties related to food safety issues." (§ 113947.1, subd. (f).) A local government program that requires employees of a food facility to obtain approved food safety training or certification is enforceable only if the program existed prior to January 1, 1998, and only in the form that the program existed prior to January 1, 1998. (§§ 113794.1, 113947.5.)

The City's Grocery Worker Retention Ordinance
The Los Angeles City Council adopted the Grocery Worker Retention Ordinance on December 21, 2005. The purpose of the ordinance was stated expressly in Los Angeles Municipal Code (L.A.M.C.) section 181.00: "Supermarkets and other grocery retailers are the main points of distribution for food and daily necessities for the residents of Los Angeles and are essential to the vitality of any community. The City has an interest in ensuring the welfare of the residents of these communities through the maintenance of health and safety standards in grocery establishments. Experienced grocery *58 workers with knowledge of proper sanitation procedures, health regulations, and understanding of the clientele and communities they serve are instrumental in furthering this interest. A transitional retention period upon change of ownership, control, or operation of grocery stores ensures stabilization of this vital workforce, which results in preservation of health and safety standards. Through this ordinance, the City seeks to sustain the stability of a workforce that forms the cornerstones of communities in Los Angeles."
The ordinance applies to "grocery establishments," including (1) retail stores over 15,000 square feet that sell primarily household foods for offsite consumption; and (2) retail stores with sales floors over 100,000 square feet that sell personal and household merchandise and use more than 10 percent of their sales floors for the sale of nontaxable merchandise. (L.A.M.C., §§ 181.01E, 12.24U.14.a.) Businesses that sell primarily bulk merchandise and require customers to pay a periodic fee are excluded from the regulation. (L.A.M.C., § 12.24U.14.a.)
When control of a grocery establishment changes due to the sale or transfer of the assets or controlling interest, the ordinance requires the successor grocery employer to hire employees from a list of employees who worked at the store prior to the change in control, other than managerial, supervisory, or confidential employees. (L.A.M.C., §§ 181.01, 181.02B.) If the successor employer needs fewer employees than its predecessor, the employees must be hired based on seniority or pursuant to the terms of a relevant collective bargaining agreement. (L.A.M.C., § 181.03B.)
For 90 days after the establishment is fully operational and open to the public, the successor employer cannot discharge the employees hired under the ordinance except for cause. (L.A.M.C., § 181.03A, C.) At the end of the 90-day period, the employer must provide a written performance evaluation as to each employee. (L.A.M.C., § 181.03D.) If the employee's performance was satisfactory, the employer must consider offering the worker continued employment. (L.A.M.C., § 181.03D.) Workers may bring an action against the predecessor or successor employer, as appropriate, for violations of the ordinance, seeking reinstatement, front pay and backpay, value of lost benefits, and attorney fees. (L.A.M.C., § 181.05.)
Parties subject to the ordinance may execute a collective bargaining agreement that supersedes requirements of the ordinance. (L.A.M.C., § 181.06.)

Legislative History of the Ordinance
In July 2005, the city council requested that the city attorney prepare an ordinance that would extend existing permitting requirements and standards *59 for public venues to supermarkets and provide for transitional worker retention to assure the maintenance of these standards when supermarket establishments change ownership. Ultimately, the ordinance focused solely on transitional worker retention.
The city attorney presented a report to the city council along with the draft of the grocery worker retention ordinance. The report concluded that the ordinance was not preempted by state or federal labor laws and discussed the rational basis for the ordinance. The report did not mention any state laws governing health and safety standards.
At a city council hearing on the proposed ordinance on December 14, 2005, the city attorney's representative explained that the City could use its police powers to regulate private industry in order to promote the health, welfare, and safety of its residents. The proposed transitional period for grocery store workers addressed the City's concern for sanitary procedures, the proper handling of food, and possibly the unique clientele of a specific store.
During the discussion of the ordinance, Councilmember Alex Padilla emphasized the importance of maintaining stability in the workforce that ensures food is safe and sanitary. Councilmember Janice Hahn approved of the ordinance's protection for grocery store workers. Her view was that the City should eventually protect workers in all industries that are commonly subject to buyouts and mergers.
Councilmember Dennis Zine expressed concern that 90 days did not allow employees sufficient time to rearrange their lives and find other jobs. In response, the city attorney's representative explained that the ordinance was focused on health, safety, and welfare. The 90-day period in the ordinance was designed to ensure that workers employed during the transition would have "familiarity and an understanding of sanitary procedures and other health and safety issues when it comes to grocery store[s] and handling food and possibly knowing, again, the clientele of that ... community. So, that's where the 90 days comes from again, is, this concern over health, safety and welfare. Do we have employees early on in this change of ownership who really know how to deal with health and safety issues pertaining to that type of business." Councilmember Zine reiterated his support for the ordinance simply on the basis of the protection it provided workers.
Councilmember Bill Rosendahl offered his perception that two issues were at stake: health and safety concerns and workers' rights. He supported the ordinance for both reasons. Councilmember Eric Garcetti spoke next to acknowledge that privately, he might share concerns for middle-class workers *60 similar to those expressed by his colleagues, but as a public policy maker, his support for the ordinance was with "very clear intent about the health and welfare of communities." He cautioned that as public policy makers, they could not simply follow their hearts, but needed to be sure that the ordinance rested on secure legal ground. He asked the city attorney's representative to identify the "rational basis" for the ordinance. The city attorney's representative explained the City's interest in ensuring that state and federal standards and county regulations regarding distribution of specific kinds of raw meat and produce are maintained. The representative concluded, as was stated in the city attorney's report, that the rational basis for the ordinance "is to keep the industry knowledge for a transition period when the establishments change ownership so that that knowledge isn't lost when the personnel changes."
Councilmember Tony Cardenas made general statements in support of grocery store workers and the importance of decent wages and benefits for workers. He endorsed the ordinance because it required companies to provide employees an opportunity to transition their employment "in a legal way."
Councilmember Bernard Parks commented on the unfairness of placing the entire cost burden for the employees on the new owner and no significant responsibility on the prior owner who had the relationship with the employees. He asked whether the ordinance could legally require the former owner to pay the employees' salaries for a portion of the 90-day period. The city attorney's representative opined that it was beyond the City's jurisdiction to enact such a requirement.
Councilmember Parks asked whether the ordinance could be applied to all retailers. The city attorney's representative stated, "We would be pleased to look at other scenarios; but, again, there would have to be an appropriate finding in order to support the use of the City's police powers for those other retail establishments." The matter was put over for a second reading.
The final legislative hearing on the ordinance was held on December 21, 2005. Councilmember Parks asked for the city attorney's opinion on a letter that the council had received from the California Grocers Association (CGA) arguing that the ordinance was defective, because it was not a valid exercise of the City's police power, was preempted by federal and state laws, such as labor laws, and violated the equal protection provisions of the state and federal Constitutions. The city attorney's representative responded that after looking at similar ordinances and case law, "our office is prepared to aggressively defend this in the event of litigation." Councilmember Parks disapproved of the ordinance, because he believed it would discourage grocery stores from coming in to serve communities struggling to attract and retain grocery stores.
*61 Councilmember Padilla encouraged his colleagues to support the ordinance because "[t]he health and safety of our residents are a big concern" and "[t]his is a way to help strengthen the health and safety regulations within the City of Los Angeles."
Councilmember Greig Smith expressed concern that the legality of the ordinance was not sufficiently clear and the City might incur a considerable financial burden to defend the ordinance if the city attorney had to bring in an outside consultant. In addition, he questioned the claim that the ordinance protected the health of the residents. The city attorney's representative responded, "To answer your last question, the ordinance doesn't set forth any additional regulations on health and safety. It does work to preserve the industry knowledge of the existing laws, so that when the personnel transitions from store to store, that industry knowledge is retained." Councilmember Smith argued that compliance with laws governing proper handling of produce, dairy, and meat, to protect health and safety, was already monitored by the county health department. The city attorney's representative responded, "But the county health department doesn't require workers to retain the knowledge during a transition. This specifically addresses that moment when the stores change hands." The city attorney's representative explained the ordinance was a precautionary measure to ensure that grocery stores complied with county health regulations. Councilmember Smith characterized the justification as weak and believed the ordinance would be a disincentive for grocery stores to experiment in underserved communities.
Councilmember Zine reiterated his concern that the ordinance did not guaranty that the workers would be retained after the 90-day period and instead allowed them to be replaced with a new workforce that did not have to be represented by a union. The city attorney's representative agreed with Councilmember Zine's assessment of the limits of the protection afforded workers under the ordinance and added that "within those [90] days, the new owner would have an opportunity to be training the new workforce, if the new owner wanted to replace the existing workforce after that [90] days. That new workforce, during the [90] days, with adequate training, would be in a better position to safeguard the public's health, safety, and welfare." Councilmember Zine expressed his support of the ordinance, although he considered 90 days insufficient time for employees to make plans for their future.
Councilmember Rosendahl asked the city attorney's office to explain the health and safety aspects of the retention plan again. The city attorney's representative stated, "If we consider this under a rational-basis test, which the courts would likely apply, the government's legitimate concern is preserving the health and safety of its citizens through the proper handling of foodmeat, produce, et ceterafollowing [state, federal,] and county regulations. By preserving the industry knowledge from the incumbent grocery *62 employer's personnel to the successor grocery employer's personnel, we are maintaining those health and safety standards." Councilmember Zine expressed his support for grocery store workers. He urged approval of the measure and stated, "This gives a little more dignity to the process of mergers and acquisitions. Ninety days isn't the end of the world for anybody who is on the corporate side, but it does give a worker at least a chance to think about his future and his life. [¶] I know we are not considering it from that perspective; it's health and safety. But their health and safety matters to me as well."
Councilmember Hahn described the type of health and safety knowledge that grocery store employees gain through experience, stated that she would not want to shop at a grocery store that did not retain the predecessor's employers, and expressed support for the measure. Councilmember Jose Huizar stated that, as an attorney, "we all know that ... health and safety [is] a term of art in the legal sense and its often used to regulate commerce, whether it's by cities or the state or the federal government." He argued that the 90-day period would not affect an employer's ability to do business significantly, but would provide reassurance to the families of grocery workers in the event of a change of ownership, and offered his support of the ordinance.
In closing remarks, Councilmember Parks noted that the City spends approximately $30 million annually for the services of outside counsel. If the ordinance created litigation likely to require outside counsel, it would add to the already significant cost of the City's legal fees. In his opinion, businesses would not be hurt by the ordinance, because they would simply choose to locate outside the City, and it would be the community that was hurt by the ordinance.
The ordinance was approved, with 11 council members voting in favor and two council members voting against it.

Procedural History
On May 4, 2006, plaintiff and respondent CGA filed a complaint against the City seeking to enjoin enforcement of the ordinance on the grounds that it was preempted by state and federal labor laws, violated the equal protection provisions of the state and federal Constitutions, and was preempted by the provisions of the Health and Safety Code. CGA filed an amended complaint adding allegations of standing.
On August 16, 2006, LAANE intervened to defend the ordinance.
A bench trial took place on August 1 and 2, 2007. On February 11, 2008, the trial court entered the judgment declaring the ordinance void, because it *63 entered a field that is fully occupied by and conflicts with state law, specifically the CRFC. The court declared that the ordinance was also void because it violated the equal protection provisions of the federal and state Constitutions. The judgment enjoined the City from enforcing the ordinance. The City and LAANE filed timely notices of appeal.

DISCUSSION

State Preemption
The City and LAANE contend that the ordinance is not preempted by the CRFC, because the purpose of the ordinance is to protect the job security of grocery store workers, as evidenced by the operative provisions of the ordinance and the legislative history, without any relation to health and safety standards. Their interpretation of the ordinance is unpersuasive.
(1) The California Constitution allows cities and counties to "make and enforce within [their] limits all local, police, sanitary, and other ordinances and regulations not in conflict with general [state] laws." (Cal. Const., art. XI, § 7.) An ordinance that conflicts with state law is preempted and void. (O'Connell v. City of Stockton (2007) 41 Cal.4th 1061, 1065 [63 Cal.Rptr.3d 67, 162 P.3d 583] (O'Connell).)
"An ordinance can conflict with state law in any of several ways: A conflict exists if the local legislation duplicates or contradicts general law or if the local legislation attempts to enter an area fully occupied by general law. (O'Connell, supra, 41 Cal.4th at p. 1067.) An area can be `fully occupied by general law' either because the Legislature has expressly prohibited further local legislation or because the state legislative scheme implies such a prohibition. (Ibid.)" (Tosi v. County of Fresno (2008) 161 Cal.App.4th 799, 804 [74 Cal.Rptr.3d 727].)
"If the subject matter or field of the [local] legislation has been fully occupied by the state, there is no room for supplementary or complementary local legislation, even if the subject were otherwise one properly characterized as a `municipal affair.' [Citations.]" (Lancaster v. Municipal Court (1972) 6 Cal.3d 805, 808 [100 Cal.Rptr. 609, 494 P.2d 681].) Statutory construction and the determination of legislative intent are questions of law that we review de novo. (Bravo Vending v. City of Rancho Mirage (1993) 16 Cal.App.4th 383, 391-392 [20 Cal.Rptr.2d 164] (Bravo).)
The Legislature has expressly stated its intent to fully occupy and exclusively regulate the field of health and sanitation standards for retail food facilities, including employee knowledge of food safety, with only limited *64 exceptions. The City's grocery worker retention ordinance is preempted if it regulates the same field of conduct occupied by the CRFC.
(2) To determine the subject matter regulated by a local ordinance, the trial court looks "not only at the face of the ordinance, but also at the purpose for which the ordinance was enacted. [Citation.]" (Bravo, supra, 16 Cal.App.4th at p. 404.) If the Legislature's intent is to fully occupy a particular field, "then local entities should not be allowed to frustrate that intent by enforcing ordinances which have the purpose and effect of intruding into that restricted subject matter, but which are so carefully drafted as to avoid the appearance of doing so. A city should not be permitted to hide the preempted substance of a regulation behind its nonpreempted form." (Id. at p. 405.)
Statements made by legislators during a debate on the proposed legislation may be considered to determine the legislation's purpose when relevant to its validity. (Bravo, supra, 16 Cal.App.4th at p. 407.) "In summary, the legislative history will be considered to the extent that it reveals the arguments made, the legislative discussion concerning, and the events leading up to, the adoption [of the local ordinance]." (Id. at p. 408.)
The city council expressly stated in L.A.M.C. section 181.00 that the purpose of the employee retention period was to preserve health and safety standards in grocery establishments during a change of ownership by ensuring the stability of the experienced workforce with knowledge of proper sanitation procedures, health regulations, and the clientele and communities they serve.
The operative provisions of the ordinance accomplish the City's purpose to preserve health and safety standards in grocery establishments by requiring successor grocery store employers to hire the experienced employees of the prior grocery store operator. In other words, successor grocery employers must employ an experienced workforce that is knowledgeable about health and sanitation standards for the first 90 days of operation, resulting in the preservation of health and safety standards at the store during the transition period. Our conclusion is not altered by the fact that the ordinance applies to different types of grocery store employees, from janitors to dockworkers to cashiers, all of whom are involved in their different roles in providing food to the public and maintaining the standards at the facility.
State laws, however, do not require grocery stores to hire employees with particular training or a minimum of six months' experience for the first 90 days of their operation. The state scheme balances the interest in maintaining health and sanitation standards at food facilities with reasonable hiring and *65 training costs. State law provides food facilities with a 60-day grace period for an owner or employee to become certified. Thereafter, it is the certified food employee's responsibility to ensure that other food employees have proper knowledge of food safety, as may be appropriate to their positions. There is no requirement in the CRFC that newly hired employees have any prior knowledge or experience as to sanitation, health or other grocery store regulations. The City cannot intrude into the preempted field of health and sanitation standards for retail food facilities by requiring grocery employers to hire employees with more training and experience than required under state law.
The City contends the comments of individual city council members during the hearings on the ordinance establish that the intent of the ordinance was to ensure job security for grocery store workers. We disagree. Some council members expressed support for the ordinance because it offered protection for grocery store workers or questioned the city attorney's representative as to whether the provisions could provide additional job security for grocery store workers. The city attorney's representative and other council members consistently responded that the ordinance was designed to maintain health and safety standards, not to protect the jobs of grocery store workers. Moreover, just six of the council members who voted to approve the ordinance commented with approval on the protection that the ordinance happened to offer to workers. It is clear that the ordinance was carefully tailored to maintain health and safety standards and not designed simply to protect displaced workers.
(3) During oral argument on appeal, counsel for the City argued that the representatives of the city attorney's office who had advised the city council members at the public hearings had been misinformed as to the purpose of the ordinance. The argument is not persuasive. We note that the city attorney's office repeatedly advised the council that the proposed ordinance was a health and safety provision. Moreover, the city attorney did not suggest enactment of a displaced worker ordinance without regard to maintaining health and safety standards in grocery stores, which might have addressed some of the concerns expressed by council members, such as whether the ordinance could be extended to additional retailers, whether the cost burden should be shared by or placed on the original employer, and whether the protections for workers under the ordinance could be extended beyond 90 days. It is clear from the operative provisions of the ordinance, the express statement of purpose, and the legislative history that the City intended to regulate health and sanitation standards in grocery establishments through enactment of the Grocery Worker Retention Ordinance. The ordinance is preempted.

*66 Federal Labor Law Preemption

Even were we to conclude that the ordinance is not preempted by the CRFC, the City and LAANE suffered no prejudice from the trial court's ruling because the ordinance is preempted by federal labor law.

A. Review

The City and LAANE contend this court cannot review the trial court's conclusion that the ordinance is not preempted by the NLRA, because CGA did not file a cross-appeal. We disagree.
"A fundamental principle of appellate review is that a judgment correct in law will not be reversed merely because given for the wrong reason; we review the trial court's judgment, not its reasoning." (Mayer v. C.W. Driver (2002) 98 Cal.App.4th 48, 64 [120 Cal.Rptr.2d 535].) Although a respondent who has not appealed from the judgment usually cannot raise an error on appeal (California State Employees' Assn. v. State Personnel Bd. (1986) 178 Cal.App.3d 372, 382 [223 Cal.Rptr. 826]), Code of Civil Procedure section 906 provides an exception: "Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party, including, on any appeal from the judgment, any order on motion for a new trial, and may affirm, reverse or modify any judgment or order appealed from and may direct the proper judgment or order to be entered, and may, if necessary or proper, direct a new trial or further proceedings to be had. The respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any of the foregoing matters for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken. The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken."
(4) "The purpose of the statutory exception is to allow a respondent to assert a legal theory which may result in affirmance of the judgment. [Citations.]" (California State Employees' Assn. v. State Personnel Bd., supra, 178 Cal.App.3d at p. 382, fn. 7.) Without having cross-appealed, a party can properly raise an argument in its capacity as a respondent that shows the trial court reached the right result, even if on the wrong theory. (Mayer v. C.W. Driver, supra, 98 Cal.App.4th at p. 57.)
CGA's complaint sought a simple remedya declaration that the ordinance was invalid for a variety of reasons. The trial court concluded the *67 ordinance was not preempted by federal labor law, but entered judgment in favor of CGA on other grounds. CGA did not have occasion to appeal from the judgment, as it won exactly what it sought in the complaint, which was a declaration the ordinance was invalid. Having received the very remedy it sought in its complaint, CGA may properly raise the issue of federal preemption in response to the City and LAANE's appeal in order to show that the City and LAANE were not prejudiced by any error in the trial court's rulings. We may review whether the ordinance is preempted by federal labor law in order to affirm the judgment.

B. The NLRA Preemption

((5)) "The NLRA `is a comprehensive code passed by Congress to regulate labor relations in activities affecting interstate and foreign commerce.' [Citation.]" (Com. Edison Co. v. Intern. Broth. Of Elec. Workers (N.D.Ill. 1997) 961 F.Supp. 1169, 1178.) "The NLRA declares the policy of the United States to eliminate or mitigate obstructions to the free flow of commerce caused by industrial strife, unrest, and unequal bargaining power, `by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.' (29 U.S.C. § 151.)" (Southern California Edison Co. v. Public Utilities Com. (2006) 140 Cal.App.4th 1085, 1096-1097 [45 Cal.Rptr.3d 485].) "The act authorizes the National Labor Relations Board (NLRB) to adjudicate disputes concerning unfair labor practices and to prevent any person from engaging in an unfair labor practice affecting commerce. [Citation.]" (Id. at p. 1097.)
(6) The United States Supreme Court has articulated two types of preemption that are implicitly mandated by the NLRA in order to implement federal labor policy. (Chamber of Commerce of United States v. Brown (2008) 554 U.S. ___, ___ [171 L.Ed.2d 264, 128 S.Ct. 2408, 2412] (Brown).) "Garmon pre-emption" (San Diego Unions v. Garmon (1959) 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773]) prevents states from interfering with the National Labor Relations Board's (NLRB) interpretation and enforcement of the NLRA by prohibiting state regulation of activities that the NLRA protects, prohibits, or arguably protects or prohibits. (Brown, supra, at p. ___ [128 S.Ct. at p. 2412].) "Machinists pre-emption" (Machinists v. Wisconsin Emp. Rel. Comm'n (1976) 427 U.S. 132 [49 L.Ed.2d 396, 96 S.Ct. 2548]) prevents states and the NLRB from regulating "conduct that Congress intended `be unregulated because left "to be controlled by the free play of economic forces."' [(Id. at p. 140, quoting NLRB v. Nash-Finch Co. (1971) 404 U.S. 138, 144 [30 L.Ed.2d 328, 92 S.Ct. 373])]." (Brown, supra, 554 U.S. at p. ___ [128 S.Ct. at p. 2412].)
*68 "Machinists pre-emption is based on the premise that `"Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes."' [Citation.]" (Brown, supra, 554 U.S. at p. ___ [128 S.Ct. at p. 2412].) "Under this preemption principle, states cannot regulate the economic weapons that are part and parcel of the collective bargaining process. Resort to economic weapons is the right of the employer as well as the employee and the `State may not prohibit the use of such weapons or add to an employer's federal legal obligations in collective bargaining any more than in the case of employees.' [Citation.]" (United Steelworkers v. St. Gabriel's Hosp. (D.Minn. 1994) 871 F.Supp. 335, 340.)
(7) "In devising the NLRA, Congress chose to regulate some aspects of labor activities and to leave others `"unrestricted by any governmental power to regulate."' [Citation.] By prohibiting specific economic weapons and consciously deciding not to regulate others, Congress struck a balance `"between the uncontrolled power of management and labor to further their respective interests."' [Citation.] States `are without authority to attempt to introduce some standard of properly "balanced" bargaining power, or to define what economic sanctions might be permitted negotiating parties in an "ideal" or "balanced" state of collective bargaining.' [Citation.]" (United Steelworkers v. St. Gabriel's Hosp., supra, 871 F.Supp. at p. 340.)

C. Federal Successorship Law

(8) A new company may be considered the successor of a prior company for the purpose of compelling legal obligations to the predecessor's employees, including the duty to recognize and bargain with the union representing the employees of the former company, the duty to remedy unfair labor practices, or the duty to arbitrate. (Howard Johnson Co. v. Hotel Employees (1974) 417 U.S. 249, 264, fn. 9 [41 L.Ed.2d 46, 94 S.Ct. 2236] (Howard Johnson).) "The term `successor' is not very meaningful in the abstract; every new employer is a successor in the sense that it succeeded to the operation of a business entity formerly operated by another employer. The NLRA does not define successorship or address the labor law obligations of a new employer to the employees of its predecessor. Rather, the federal common law of successorship has developed primarily through Supreme Court decisions." (United Steelworkers v. St. Gabriel's Hosp., supra, 871 F.Supp. at p. 338.)
(9) The determination of whether a new company is a successor focuses on whether there is "substantial continuity" between the enterprises. (Fall River Dyeing & Finishing Corp. v. NLRB (1987) 482 U.S. 27, 43 [96 L.Ed.2d 22, 107 S.Ct. 2225] (Fall River).) The evaluation "is primarily factual in nature and is based upon the totality of the circumstances of a given situation, *69 [requiring the NLRB to] focus on whether the new company has `acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.' [Citation.]" (Ibid.) "Under this approach, the [NLRB] examines a number of factors: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. [Citations.]" (Ibid.) "Where a new employer operates essentially the same business without substantial change and hires a majority of its employees from the predecessor, it is generally deemed a successor under federal labor law. [Citation.]" (United Steelworkers v. St. Gabriel's Hosp., supra, 871 F.Supp. at p. 338.)
(10) The United States Supreme Court has relied on basic principles of federal labor law in deciding successorship cases, requiring the court to balance the right of employers to rearrange their businesses and make independent hiring decisions, so long as they do not discriminate in hiring or retention on the basis of union membership or activity, with avoidance of industrial strife and protection for employees from sudden changes in the terms and conditions of their employment in the transition from one employer to another. (John Wiley & Sons v. Livingston (1964) 376 U.S. 543, 548-550 [11 L.Ed.2d 898, 84 S.Ct. 909] (Wiley); Howard Johnson, supra, 417 U.S. at pp. 261-264.)
The United States Supreme Court first addressed the issue of successorship in Wiley, holding that a union representing the employees of a predecessor could compel the successor employer to arbitrate under section 301 of the Labor-Management Relations Act, 1947 (29 U.S.C. § 185) under the circumstances of that case. (Howard Johnson, supra, 417 U.S. at p. 254.) The predecessor corporate employer had merged with another corporation. (Wiley, supra, 376 U.S. pp. 544-545.) The surviving corporation "hired all of the merged corporation's employees and continued to operate the enterprise in a substantially identical form." (Howard Johnson, supra, at pp. 253-254.) The employees "`continued to perform the same work on the same products under the same management at the same work place as before [the merger].'" (Id. at p. 258.) The general rule under state law was that in a merger, the surviving corporation was liable for the obligations of the disappearing corporation. (Id. at p. 257.) Under these circumstances, the Wiley court held that the successor employer had a duty to arbitrate with the union representing the employees of the predecessor corporation under the collective bargaining agreement between the union and the predecessor corporation. (Wiley, supra, at p. 551.)
*70 The Wiley court emphasized that "[t]he objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship. The transition from one corporate organization to another will in most cases be eased and industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by `the relative strength ... of the contending forces,' [citation]." (Wiley, supra, 376 U.S. at p. 549.)
However, in NLRB v. Burns Security Services, Inc. (1972) 406 U.S. 272, 281-282 [32 L.Ed.2d 61, 92 S.Ct. 1571] (Burns), the Supreme Court concluded that while the successor employer had a duty to bargain with the union representing the employees of the predecessor corporation, the successor was not bound to observe the terms of a collective bargaining contract negotiated with the predecessor employer. A company named Wackenhut provided security services for a Lockheed Aircraft Service Co. plant and its employees were represented by a union certified by the NLRB as the exclusive bargaining unit for these employees. (Id. at pp. 274-275.) Burns successfully bid on the contract. (Ibid.) Burns did not purchase any of Wackenhut's assets or become liable for any of Wackenhut's financial obligations, but 27 of the 42 guards that Burns hired to provide security at the site were Wackenhut employees. (Id. at pp. 284-286.) The NLRB found Burns was required to bargain with the Wackenhut employees' union and honor the substantive provisions of the collective bargaining agreement between the union and Wackenhut. (Id. at p. 274.)
The Burns court explained that the NLRA imposes a duty on employers to bargain with the representatives selected by a majority of the employees in an appropriate unit. (Burns, supra, 406 U.S. at p. 277.) Under section 8 of the NLRA, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." (29 U.S.C. § 158(a)(5).) "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment...." (29 U.S.C. § 159(a).)
The Burns court accepted the NLRB's conclusion that Burns had an obligation to bargain with the union over terms and conditions of employment as a result of its hiring of the former contractor's employees and the recent election and NLRB certification of the union. (Burns, supra, 406 U.S. at pp. 278-279.) However, the Burns court stated that the case would be *71 different "if Burns had not hired employees already represented by a union certified as a bargaining agent." (Id. at pp. 280-281.) "The [NLRB] has never held that the [NLRA] itself requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer. [Citation.] However, an employer who declines to hire employees solely because they are members of a union commits a [section] 8(a)(3) unfair labor practice. [Citations.]" (Burns, supra, 406 U.S. at pp. 280-281, fn. 5.)
The Burns court rejected the NLRB's conclusion that Burns was required to adhere to the terms of the collective bargaining agreement negotiated with the predecessor which Burns had not expressly nor impliedly assumed. (Burns, supra, 406 U.S. at pp. 281-282.) "Preventing industrial strife is an important aim of federal labor legislation, but Congress has not chosen to make the bargaining freedom of employers and unions totally subordinate to this goal." (Id. at p. 287.) "The source of [Burns's] duty to bargain with the union is not the collective-bargaining contract but the fact that it voluntarily took over a bargaining unit that was largely intact and that had been certified within the past year. Nothing in its actions, however, indicated that Burns was assuming the obligations of the contract, and `allowing the [NLRB] to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the [NLRA] is basedprivate bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract.' [Citation.]" (Ibid.)
"Burns also stressed that holding a new employer bound by the substantive terms of the pre-existing collective-bargaining agreement might inhibit the free transfer of capital, and that new employers must be free to make substantial changes in the operation of the enterprise. [Citation.]" (Howard Johnson, supra, 417 U.S. at p. 255.) "A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital. On the other hand, a union may have made concessions to a small or failing employer that it would be unwilling to make to a large or economically successful firm. The congressional policy manifest in the [NLRA] is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities." (Burns, supra, 406 U.S. at pp. 287-288.)
The Burns court noted that "in a variety of circumstances involving a merger, stock acquisition, reorganization, or assets purchase, the [NLRB] *72 might properly find as a matter of fact that the successor had assumed the obligations under the old contract. [Citation.]" (Burns, supra, 406 U.S. at p. 291.)
The Supreme Court held in Howard Johnson, supra, 417 U.S. at pages 264-265, that there was no substantial continuity between businesses when the new employer purchased the assets of a franchisee, yet hired only a small fraction of the franchisee's employees. Howard Johnson had purchased the personal property and leased the real property necessary to operate a restaurant and motor lodge from its franchisee. (Id. at p. 251.) Although the franchisee had employed 53 employees, Howard Johnson commenced operations with 45 employees, including 9 employees who had worked for the franchisee. (Id. at p. 252.) The union that represented the franchisee's employees sought to compel Howard Johnson to arbitrate the union's claim that Howard Johnson was required to hire all of the franchisee's employees under the collective bargaining agreement with the franchisee. (Id. at pp. 250, 260.)
The Howard Johnson court rejected the union's argument based on the principles of federal labor law articulated in Burns, namely, that federal law did not obligate the purchaser of business assets to hire all of the predecessor's employees, and a potential employer might not take over a failing business unless it could make changes to the corporate structure, the workforce, and the nature of supervision. (Howard Johnson, supra, 417 U.S. at p. 261.) The court concluded that Howard Johnson had the right not to hire any of its predecessor's employees. (Id. at pp. 261-262.)
The Howard Johnson court concluded that substantial continuity between the businesses included substantial continuity in the identity of the workforce across the change in ownership. (Howard Johnson, supra, 417 U.S. at pp. 263-264.) "This holding is compelled, in our view, if the protection afforded employee interests in a change of ownership by Wiley is to be reconciled with the new employer's right to operate the enterprise with his own independent labor force." (Id. at p. 264.) Finding no substantial continuity of identity in the workforce hired by Howard Johnson and no assumption of the franchisee's agreement to arbitrate, either express or implied, the court held that Howard Johnson was not required to arbitrate the extent of its obligations to the franchisee's employees. (Id. at pp. 264-265.)
The court noted that an "alter ego" case, in which the successor corporation is "merely a disguised continuance" of the predecessor corporation, involves "a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management. In these circumstances, *73 the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor. [Citations.]" (Howard Johnson, supra, 417 U.S. at p. 259, fn. 5.)
In Fall River, the Supreme Court concluded a new company was a successor employer required to bargain with the union that represented the predecessor's employees. (Fall River, supra, 482 U.S. at pp. 37-42.) In that case, a textile dyeing and finishing company named Sterlingwale went out of business. A former employee of Sterlingwale and the president of one of Sterlingwale's major customers formed a new company named Fall River. Fall River purchased Sterlingwale's real property and assets from Sterlingwale's creditors and purchased some of Sterlingwale's remaining inventory at a liquidator's auction. (Id. at p. 32.) Eighteen of 21 employees that Fall River initially hired were former employees of Sterlingwale. Within two months of hiring the employees, the union that had represented Sterlingwale's employees wrote a letter requesting that Fall River recognize it as the bargaining agent of Fall River's employees and begin collective bargaining. (Id. at pp. 32-33.) Fall River refused. (Id. at p. 33.) Three months later, Fall River employed a total of 55 workers, of which 36 were former Sterlingwale employees. Fall River ultimately employed 107 employees, of which 52 or 53 were former Sterlingwale employees. "[T]he employees experienced the same conditions they had when they were working for Sterlingwale. The production process was unchanged and the employees worked on the same machines, in the same building, with the same job classifications, under virtually the same supervisors. [Citation.] Over half the volume of [Fall River's] business came from former Sterlingwale customers .... [Citation.]" (Id. at p. 34.) There was a seven month hiatus between the termination of Sterlingwale's dyeing operations and the commencement of operations by Fall River. (Id. at p. 45.) However, based on the "substantial continuity" between the companies, the court found that Fall River was a successor to Sterlingwale.
The court held that Fall River was required to bargain with the union that had represented Sterlingwale's employees based on traditional presumptions of a union's majority support. (Fall River, supra, 482 U.S. at pp. 37-42.) The court explained the competing policy concerns as follows: "The overriding policy of the NLRA is `industrial peace.' [Citation.] The presumptions of majority support further this policy by `promot[ing] stability in collective-bargaining relationships, without impairing the free choice of employees.' [Citation.]" (Id. at p. 38.) The presumptions of majority support alleviate unions' concerns that they will lose majority support unless they produce immediate results and reduce employers' incentive to delay and avoid good faith bargaining in order to undermine support for the unions, thereby allowing unions to develop stable bargaining relationships, "which will *74 enable the unions to pursue the goals of their members, and this pursuit, in turn, will further industrial peace." (Id. at pp. 38-39.)
The court explained that the rationale underlying the presumptions is particularly applicable in the context of successorship. (Fall River, supra, 482 U.S. at p. 39.) "During a transition between employers, a union is in a peculiarly vulnerable position. It has no formal and established bargaining relationship with the new employer, is uncertain about the new employer's plans, and cannot be sure if or when the new employer must bargain with it. While being concerned with the future of its members with the new employer, the union also must protect whatever rights still exist for its members under the collective-bargaining agreement with the predecessor employer. Accordingly, during this unsettling transition period, the union needs the presumptions of majority status to which it is entitled to safeguard its members' rights and to develop a relationship with the successor." (Ibid., fn. omitted.)
"The position of the employees also supports the application of the presumptions in the successorship situation. If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprises's transformation. This feeling is not conducive to industrial peace." (Fall River, supra, 482 U.S. at pp. 39-40.) "Without the presumptions of majority support and with the wide variety of corporate transformations possible, an employer could use a successor enterprise as a way of getting rid of a labor contract and of exploiting the employees' hesitant attitude towards the union to eliminate is continuing presence." (Id. at p. 40.)
"In addition to recognizing the traditional presumptions of union majority status, however, the Court in Burns was careful to safeguard `"the rightful prerogative of owners independently to rearrange their businesses."' [(Golden State Bottling Co. v. NLRB (1973) 414 U.S. 168, 182 [38 L.Ed.2d 388, 94 S.Ct. 414], quoting Wiley, supra, 376 U.S. at p. 549.)] We observed in Burns that, although the successor has an obligation to bargain with the union, it `is ordinarily free to set initial terms on which it will hire the employees of a predecessor,' [citation], and it is not bound by the substantive provisions of the predecessor's collective-bargaining agreement. [Citation.] We further explained that the successor is under no obligation to hire the employees of its predecessor, subject, of course, to the restriction that it not discriminate against union employees in its hiring. [Citations.] Thus, to a substantial extent the applicability of Burns rests in the hands of the successor. If the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the *75 predecessor, then the bargaining obligation of [section] 8(a)(5) is activated. This makes sense when one considers that the employer intends to take advantage of the trained work force of its predecessor." (Fall River, supra, 482 U.S. at pp. 40-41, fn. omitted.)
"Accordingly, in Burns we acknowledged the interest of the successor in its freedom to structure its business and the interest of the employees in continued representation by the union. We now hold that a successor's obligation to bargain is not limited to a situation where the union in question has been recently certified. Where, as here, the union has a rebuttable presumption of majority status, this status continues despite the change in employers. And the new employer has an obligation to bargain with that union so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor." (Fall River, supra, 482 U.S. at p. 41, fn. omitted.)

D. Preemption of the Ordinance

(11) The ordinance in this case is preempted under Machinists because it intrudes on "`a zone protected and reserved for market freedom.'" (Brown, supra, 554 U.S. at p. ___ [128 S.Ct. at p. 2412], quoting Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc. (1993) 507 U.S. 218, 227 [122 L.Ed.2d 565, 113 S.Ct. 1190].) When a grocery store owner sells or transfers the assets of a grocery store in the City, or a controlling interest in the grocery store, the ordinance requires the successor grocery employer to hire the predecessor's employees. (L.A.M.C., §§ 181.01, 181.02B.) However, it is an established principle of federal law that an employer has the right not to hire the employees of a predecessor company, as long as the employer does not discriminate against union members in hiring. The Supreme Court's successorship decisions have observed a careful balance between an employer's freedom to rearrange a business, the employees' need for stability, and the policy to avoid industrial strife.
Under federal labor law, a new employer is not required to hire a predecessor's employees and successorship rests largely in the hands of the new employer through its hiring decisions, but if a substantial continuity is found to exist between the two businesses, the new employer is required to bargain with the representative of employees of a former employer. Under the ordinance, a new grocery establishment that purchases the assets of a predecessor must hire all of the predecessor's employees. Although the determination of whether a company is a successor is based on the totality of the circumstances, there are only two possible outcomes: the new company is a successor or it is not. It seems clear that in cases subject to the NLRA, a *76 substantial continuity of the business enterprise will be found when a new employer acquires the predecessor's assets and hires all of the predecessor's employees to perform the same work at the same work place. Therefore, as a result of the ordinance, the new employer will have an obligation to bargain with the employees' representative. In fact, as a practical matter, it seems that a new employer who hires all of the employees of a predecessor company will generally be required to bargain with the employee's representative, regardless of any other circumstances. Thus, in cases subject to the NLRA, the ordinance imposes a bargaining obligation on all new grocery store employers that the NLRA imposes on only those employers who freely hire the predecessor's employees.
Or if instead, the forced hiring of a predecessor's employees is disregarded in the assessment of whether there is a substantial continuity between two businesses and the employer is determined not to be a successor, the ordinance will trample the employees' rights to select the bargaining agents of their choice to deal with their employer and to rely on a successor employer's legal obligations under the NLRA.
We conclude that the ordinance invades a zone reserved to market freedom and alters the bargaining process established under federal law, as shown by its effect on a new employer's obligation to bargain with the employees of its predecessor. Therefore, the ordinance is preempted by the NLRA and federal labor law interpreting its provisions.[2]
(12) The court of appeals for the District of Columbia considered a similar retention ordinance in Washington Service Contractors Coalition v. District of Columbia (1995) 311 U.S. App.D.C. 407 [54 F.3d 811, 816-817] (Washington Service) and held, in a divided opinion, that the ordinance was not preempted. We disagree with the reasoning of the majority in Washington Service. The majority suggested that if the NLRB were to consider a case under the District of Columbia ordinance and find that the acquiring employer was not required to bargain because the employer had been forced to hire the predecessor's employees, then no conflict with federal labor law existed. However, this analysis disregards the conflict that would arise with regard to the protection of employees' rights under those circumstances. The Washington Service majority also reasoned that if the NLRB considered a case under the District of Columbia ordinance and found the successorship doctrine applied, then the NLRB's judgment would be that the ordinance was congruent with the goals of federal labor policy, and therefore, could not be *77 said to conflict with the NLRA. This is clearly incorrect. In Burns, the NLRB concluded the substantive provisions of a collective bargaining agreement could be imposed on a successor company in keeping with the policies of federal labor law and the Burns court rejected the NLRB's interpretation. The Washington Service majority also reasoned that employers are not free to refuse to hire employees on the basis of union membership, and therefore, no employer freedom was compromised by the ordinance. This analysis ignores the fact that employers are free under federal labor law not to hire a predecessor's employees for other reasons. We agree with the dissent in Washington Service that the Supreme Court cases interpreting the NLRA have made it clear that "Congress intentionally left the area of successorship obligations to be controlled by the free play of market forces ...," and therefore, Machinists preemption applies. (Washington Service, supra, 54 F.3d at p. 820 (dis. opn. of Sentelle, J.).)
Washington Service was cited with approval in Alcantara v. Allied Properties, LLC (E.D.N.Y. 2004) 334 F.Supp.2d 336, 344-345. The Alcantara court concluded that a similar retention ordinance operates completely independently of the collective bargaining process. As discussed above, however, by forcing employers to hire the predecessor's employees, the ordinance affects the bargaining process by imposing an obligation to bargain on the employer or interfering with the employees' right to require the employer to bargain with their representative.
We conclude that the trial court's ruling in this case may also be affirmed on the ground that the ordinance is preempted by the NLRA.

DISPOSITION
The judgment is affirmed. Respondent California Grocers Association is awarded its costs on appeal.
Turner, P. J., concurred.
MOSK, J., Dissenting.
I dissent.
The preemption and equal protection challenges to the Grocery Worker Retention Ordinance (Los Angeles Mun. Code (L.A.M.C.), § 181.00 et seq.) (Ordinance)[1] are without merit. The Ordinance operates as a labor provision. Its operative terms govern the relationship between grocery store employees and their employers when there is a change of ownership, and it provides *78 employees with certain limited retention rights and remedies typically available for unlawful employment practicesreinstatement, front pay and backpay, and recovery of the value of lost benefits. The Ordinance neither prescribes health and safety standards nor provides a mechanism to enforce such standards. The Ordinance does not violate state or federal equal protection principles, nor is it preempted by federal labor laws. Furthermore, because this court already invalidated the Ordinance on the ground of state preemption, it was unnecessary to reach out and also invoke federal preemption, when doing so is contrary to existing authority and may call into question the validity of many local laws in this state that protect workers.[2] Accordingly, I would reverse the judgment that declares that the Ordinance is preempted by state law and violates the equal protection guarantees of the state and federal Constitutions and enjoins enforcement of the Ordinance. I would also uphold the Ordinance against the federal preemption challenge.

A. State Preemption

Our Supreme Court stated the principles governing state preemption challenges to local ordinances in O'Connell v. City of Stockton (2007) 41 Cal.4th 1061, 1067-1069 [63 Cal.Rptr.3d 67, 162 P.3d 583], as follows:
"`Under article XI, section 7 of the California Constitution, "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general [state] laws." [¶] "If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void." [Citations.] [¶] "A conflict exists if the local legislation `"duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication."'" [Citations.]' (Sherwin-Williams Co. v. City of Los Angeles (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534], italics added, fn. omitted (Sherwin-Williams); see also American Financial Services Assn. v. City of Oakland (2005) 34 Cal.4th 1239, 1251 [23 Cal.Rptr.3d 453, 104 P.3d 813] (American Financial).) We explain the italicized terms below.
"A local ordinance duplicates state law when it is `coextensive' with state law. (Sherwin-Williams, supra, 4 Cal.4th at pp. 897-898, citing In re Portnoy *79 (1942) 21 Cal.2d 237, 240 [131 P.2d 1] [as `finding "duplication" where local legislation purported to impose the same criminal prohibition that general law imposed'].)
"A local ordinance contradicts state law when it is inimical to or cannot be reconciled with state law. (Sherwin-Williams, supra, 4 Cal.4th at p. 898, citing Ex parte Daniels (1920) 183 Cal. 636, 641-648 [192 P. 442] [as finding `"contradiction"' in a local ordinance that set the maximum speed limit for vehicles below that set by state law].)
"A local ordinance enters a field fully occupied by state law in either of two situationswhen the Legislature `expressly manifest[s]' its intent to occupy the legal area or when the Legislature `impliedly' occupies the field. (Sherwin-Williams, supra, 4 Cal.4th at p. 898; see also 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 986, p. 551 [`[W]here the Legislature has manifested an intention, expressly or by implication, wholly to occupy the field ... municipal power [to regulate in that area] is lost.'].)
"When the Legislature has not expressly stated its intent to occupy an area of law, we look to whether it has impliedly done so. This occurs in three situations: when `"(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the" locality.' (Sherwin-Williams, supra, 4 Cal.4th at p. 898.)
"With respect to the implied occupation of an area of law by the Legislature's full and complete coverage of it, this court recently had this to say: `"Where the Legislature has adopted statutes governing a particular subject matter, its intent with regard to occupying the field to the exclusion of all local regulation is not to be measured alone by the language used but by the whole purpose and scope of the legislative scheme."' (American Financial, supra, 34 Cal.4th at p. 1252, quoting Tolman v. Underhill (1952) 39 Cal.2d 708, 712 [249 P.2d 280].) We went on to say: `"State regulation of a subject may be so complete and detailed as to indicate an intent to preclude local regulation."' (American Financial, supra, at p. 1252.) We thereafter observed: `"Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are covered by state legislation ceases as far as local legislation is concerned."' (Id. at p. 1253, quoting In re Lane (1962) 58 Cal.2d *80 99, 102 [22 Cal.Rptr. 857, 372 P.2d 897].) When a local ordinance is identical to a state statute, it is clear that `"the field sought to be covered by the ordinance has already been occupied"' by state law. (American Financial, supra, at p. 1253.)
"`[W]hen local government regulates in an area over which it traditionally has exercised control, such as the location of particular land uses, California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is not preempted by state statute.' (Big Creek Lumber Co. v. County of Santa Cruz (2006) 38 Cal.4th 1139, 1149 [45 Cal.Rptr.3d 21, 136 P.3d 821].)" (Accord, IT Corp. v. Solano County Bd. of Supervisors (1991) 1 Cal.4th 81, 90-91 [2 Cal.Rptr.2d 513, 820 P.2d 1023]; City of Los Angeles v. 2000 Jeep Cherokee (2008) 159 Cal.App.4th 1272, 1276-1277 [72 Cal.Rptr.3d 252].)
Our Supreme Court further stated, "The party claiming that general state law preempts a local ordinance has the burden of demonstrating preemption. (See, e.g., Kucera v. Lizza (1997) 59 Cal.App.4th 1141, 1153 [69 Cal.Rptr.2d 582].) We have been particularly `reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another.' (Fisher v. City of Berkeley (1984) 37 Cal.3d 644, 707 [209 Cal.Rptr. 682, 693 P.2d 261]; see also Great Western Shows, Inc. v. County of Los Angeles (2002) 27 Cal.4th 853, 866-867 [118 Cal.Rptr.2d 746, 44 P.3d 120].) `The common thread of the cases is that if there is a significant local interest to be served which may differ from one locality to another then the presumption favors the validity of the local ordinance against an attack of state preemption.' (Gluck v. City of Los Angeles (1979) 93 Cal.App.3d 121, 133 [155 Cal.Rptr. 435], citing, inter alia, Galvan v. Superior Court (1969) 70 Cal.2d 851, 862-864 [76 Cal.Rptr. 642, 452 P.2d 930].)" (Big Creek Lumber Co. v. County of Santa Cruz, supra, 38 Cal.4th at p. 1149.)
The issue is thus whether the Ordinance contradicts or duplicates a state statute or enters into an area fully occupied by the state Legislature. (IT Corp. v. Solano County Bd. of Supervisors, supra, 1 Cal.4th at pp. 89-90.) The trial court concluded that the Ordinance was preempted by the California Retail Food Code (Health & Saf. Code, § 113700 et seq.)[3] (CRFC). But an examination of the plain language of the Ordinance and of the CRFC demonstrates that the trial court erred.
Section 113705 of the CRFC states, "The Legislature finds and declares that the public health interest requires that there be uniform statewide health *81 and sanitation standards for retail food facilities to assure the people of this state that the food will be pure, safe, and unadulterated. . . . [I]t is the intent of the Legislature to occupy the whole field of health and sanitation standards for retail food facilities, and the standards set forth in this part and regulations adopted pursuant to this part shall be exclusive of all local health and sanitation standards relating to retail food facilities." (Italics added.)
Other provisions of the CRFC effectuate the Legislature's intent by setting forth specific standards relating to sanitation and food safety, the cleaning and sanitizing of equipment and utensils, employee hygienic practices, food safety certification examinations, food storage, the certification of farmer's markets, etc. For example, section 113982, subdivision (a)(1) requires that food be transported in vehicles in which "[t]he interior floor, sides, and top of the food holding area [are] constructed of a smooth, washable, impervious material capable of withstanding frequent cleaning." Section 113986, subdivision (a)(1) mandates "[s]eparating raw food of animal origin during transportation, storage, preparation, holding, and display from raw ready-to-eat food, including other raw food of animal origin such as fish for sushi or molluscan shellfish, or other raw ready-to-eat food such as produce, and cooked ready-to-eat food." Section 113990 prohibits using as food ice that was previously used to cool melons or fish; section 113992 requires that produce be thoroughly washed in potable water; section 114004, subdivision (a)(1) mandates, inter alia, that ready-to-eat fish be heated to a minimum internal temperature of 145 degrees Fahrenheit for 15 seconds; and section 114008 specifies the requirements for cooking raw foods of animal origin in a microwave oven.
The CRFC does not purport to govern any employment matters not directly related to food safety. The CRFC requires that employees have "adequate" knowledge of and training in food safety as it relates to their duties (§ 113947), and that facilities that serve nonprepackaged, potentially hazardous foods "have an owner or employee who has successfully passed an approved and accredited food safety certification examination . . ." (§ 113947.1, subd. (a)). The CRFC mandates that employees report to their employer if they are diagnosed with specified infectious diseases or have a lesion or open wound on their hands or arms (§ 113949.2); that employees keep their hands, arms and fingernails clean (§§ 113952, 113968); and that employees wear gloves when contacting food (§ 113973). The CRFC does not address labor matters such as employee pay, benefits, seniority, or job retention on a change of ownership.
In contrast to the CRFC, the Ordinance does not, and does not purport to, establish health and safety standards. Rather, when there is a change of ownership of a "Grocery Establishment," the Ordinance requires that the new *82 employer hire employees from a preferential list of workers who worked for the old employer prior to the takeover. (L.A.M.C., §§ 181.01C, E, 181.02B.) The employees hired by the new employer must be retained for at least 90 days, during which period the employee may only be terminated for cause (L.A.M.C., § 181.03C), or laid off according to seniority if the new employer requires fewer employees than the predecessor employer (L.A.M.C., § 181.03B). When the 90-day period ends, the new employer must perform a written evaluation of the employees and "consider" offering such employees continued employment if their performance was satisfactory. (L.A.M.C., § 181.03D.) There are record-keeping and notice requirements (L.A.M.C., § 181.04); a term allowing parties to a collective bargaining agreement expressly to opt out of the ordinance's provisions (L.A.M.C., § 181.05); and a private right of action for workers to sue for reinstatement, front pay or backpay, and the value of lost benefits (L.A.M.C., § 181.05).
The Ordinance was modeled on the 1996 Service Contractor Worker Retention Ordinance (L.A. Admin. Code, § 10.36 et seq.)which creates nearly identical worker retention rights for employees of employers who contract with the cityand the Ordinance was itself the model for the subsequent 2006 Hotel Worker Retention Ordinance (L.A.M.C., § 183.00 et seq.), which creates similar rights for workers at Los Angeles International Airport-area hotels. These other ordinances impose substantially identical obligations on employers, yet neither is even arguably related to food health and sanitation standards. I think it equally clear that the Ordinance at issue here does not prescribe "health and sanitation standards for retail food facilities." (§ 113705.)
The preemption issue is determined not by the statements of some city council members in connection with the enactment of the Ordinance or by selected excerpts from the Ordinance's preamble,[4] but by examining the "whole purpose and scope of the [state] legislative scheme." (IT Corp. v. Solano County Bd. of Supervisors, supra, 1 Cal.4th at pp. 90-91.) "In order to resolve the [preemption] issue, we must . . . examine the statute and the ordinance, each on its own terms; and finally measure the latter against the former." (Sherwin-Williams Co. v. City of Los Angeles, supra, 4 Cal.4th at p. 897.) Notwithstanding any references that might be made to the purpose of an ordinance (id. at pp. 901-902), the test is whether by its terms, "the ordinance contradicts the statute" or "enters an area fully occupied by the statute." (Id. at p. 902.) "[I]t matters not how the subject matter of the ordinance is specified." (Id. at p. 904; see also id. at p. 906.)
*83 Moreover, legislative history can be a problematic method of interpreting legislation and should be done, if at all, only when the issue involves the ambiguity of the legislation. (See J.A. Jones Construction Co. v. Superior Court (1994) 27 Cal.App.4th 1568, 1576-1580 [33 Cal.Rptr.2d 206]; Holder, Say What You Mean and Mean What You Say: The Resurrection of Plain Meaning in California Courts (1997) 30 U.C. Davis L.Rev. 569, 582-585.) Here, there is no suggestion that the Ordinance is ambiguous.
The Ordinance operates to regulate the employer-employee relationship. The Ordinance does not purport to deal with "health and sanitation standards" or otherwise enter into the field of regulation occupied by the CRFC. The Ordinance grants employees retention rights and confers those rights on employees regardless of whether they handle food, are trained in sanitation standards, are certified in food safety, or have any health and safety expertise. The Ordinance does not, for example, distinguish between employees who prepare ready-to-eat foods and those who do not, such as janitors, cashiers, security personnel, or baggers.
The Ordinance does not remotely conflict with section 113947.1. That section requires that specified food facilities must have "an owner or employee who has successfully passed an approved and accredited food safety certification examination" (§ 113947.1, subd. (a)) who is responsible for "the safety of food preparation and service, including ensuring that all employees who handle, or have responsibility for handling, nonprepackaged foods of any kind, have sufficient knowledge to ensure the safe preparation or service of the food, or both." (§ 113947.1, subd. (f).) After a change of ownership, a food facility "shall have 60 days to comply with this" requirement. (§ 113947.1, subd. (e).) The Ordinance has no bearing on this provision. The Ordinance contains no requirement regarding the retention of certified employees. Moreover, that the Ordinance expressly excludes managerial and supervisory employees (L.A.M.C., § 181.02C) further indicates that the Ordinance does not relate to state concerns about health and sanitation. State law does not preempt the Ordinance.

B. Equal Protection

Plaintiff alleges that the Ordinance is invalid under the federal and state equal protection clauses (U.S. Const., 4th Amend., § 1; Cal. Const., art. I, § 7) because it contains arbitrary classificationsbetween stores having 15,000 square feet or more and those having less than 15,000 square feet; between grocery establishments and other retail food establishments, such as stores that sell the same products but charge membership dues; and between stores having collective bargaining agreements with employees and those that do not.
*84 As this matter does not "burden a fundamental right under either the federal or state Constitutions, the rational basis test applies." (Kasler v. Lockyer (2000) 23 Cal.4th 472, 481 [97 Cal.Rptr.2d 334, 2 P.3d 581].) Under that test, "`"[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. [Citations.] Where there are `plausible reasons' for [the classification] `our inquiry is at an end.'" [Citations.]'" (Id. at pp. 481-482.) "`[U]nder the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees . . . of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative.'" (Id. at p. 482.) "Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. [Citation.] Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." (Williamson v. Lee Optical Co. (1955) 348 U.S. 483, 489 [99 L.Ed. 563, 75 S.Ct. 461] [quoted in Kasler v. Lockyer, supra, 23 Cal.4th at p. 482].)
The distinctions in the Ordinance have rational bases. First, larger supermarkets are distinct from smaller establishments, such as convenience stores, because the former are more likely to have more employees whose displacement could have material impacts on communities. Displacement of a few employees from a convenience store is unlikely to have such a material effect. Further, larger establishments can better absorb any economic impacts of the Ordinance.
Certainly supermarkets can be treated differently than other types of food establishments, such as restaurants. The size of large supermarkets, the numbers and duties of their employees and their importance to the community distinguish them from restaurants and justify differential treatment in the event of a change in ownership. The city council also could rationally distinguish between large supermarkets and membership stores. For example, membership stores may not be subject to ownership changes or employee turnover to the same extent as nonmembership grocery stores.
The distinction between establishments that have collective bargaining agreements and those that do not also is rational. Workers covered by collective bargaining agreements may well have greater bargaining power, and therefore better protections during a change in ownership, than those that are not. (See Viceroy Gold Corp. v. Aubry (9th Cir. 1996) 75 F.3d 482 [upholding provision containing union/nonunion distinction under rational *85 basis test].) Thus, I do not agree with the trial court's decision that the Ordinance is invalid under equal protection principles.

C. Federal Preemption

1. Appellate Review

The trial court ruled against plaintiff on its cause of action for a declaratory judgment that the Ordinance is preempted by the National Labor Relations Act (29 U.S.C. § 151 et seq.) (NLRA). Plaintiff did not cross-appeal the adverse ruling on that claim. (See Gonzales v. R. J. Novick Constr. Co. (1978) 20 Cal.3d 798, 806 [144 Cal.Rptr. 408, 575 P.2d 1190] [defendant who prevailed in trial court took conditional, protective cross-appeal of adverse portion of judgment "to be abandoned in the event of affirmance" on appeal taken by plaintiff].) Because plaintiff did not cross-appeal the adverse judgment on its NLRA preemption claim, there is a question whether this court has jurisdiction to review the issue. (Adoption of Alexander S. (1988) 44 Cal.3d 857, 864 [245 Cal.Rptr. 1, 750 P.2d 778] [although other issues between the parties were properly before the court, the Court of Appeal had no jurisdiction to address appealable judgment when litigant did not file notice of appeal]; see also Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc. (1997) 15 Cal.4th 51, 56 [61 Cal.Rptr.2d 166, 931 P.2d 344] [timely appeal from judgment is jurisdictional requirement].)
Code of Civil Procedure section 906 (section 906) may not permit review of the federal preemption issue. Although section 906 permits a respondent to raise a claim of error for "the purpose of determining whether or not the appellant was prejudiced," section 906 contains an express limitation on the allowance: "The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken." (Italics added.) The judgment here does not give the relief plaintiff requested on its claim for a declaration of federal preemption, and thus plaintiff could be deemed an "aggrieved" party under Code of Civil Procedure section 901. Had plaintiff's only claim been federal preemption, then the trial court's adverse ruling would have been appealable. On the other hand, because plaintiff obtained invalidation of the Ordinance on other grounds, one can argue that plaintiff is not "aggrieved" by the trial court's ruling on federal preemption.
But if the trial court's decision on plaintiff's federal preemption claim was appealable, Code of Civil Procedure section 906 does not, in the guise of assessing "prejudice," authorize this court to review that decision, without a notice of a cross-appeal. This is not a case in which the respondent asserts *86 error in an intermediate ruling that, if corrected, would negate the prejudice to the appellant of subsequent error in rendering the judgment from which the appeal was taken. (See, e.g., Redevelopment Agency of San Diego v. Attisha (2005) 128 Cal.App.4th 357, 374 [27 Cal.Rptr.3d 126] [evidentiary error]; Erikson v. Weiner (1996) 48 Cal.App.4th 1663, 1671 [56 Cal.Rptr.2d 362] [evidentiary error]; Citizens for Uniform Laws v. County of Contra Costa (1991) 233 Cal.App.3d 1468, 1472 [285 Cal.Rptr. 456].) Here, plaintiff asks this court, in effect, to reverse the trial court's adverse ruling on a separate and distinct claim without having appealed that claim or permitted defendants a full and fair opportunity to brief the issues. Arguably, section 906 does not authorize this court to do so. (Kardly v. State Farm Mut. Auto. Ins. Co. (1995) 31 Cal.App.4th 1746, 1748-1749, fn. 1 [37 Cal.Rptr.2d 612] [when appeal concerned judgment for respondent for compensatory damages, respondent could not assert error in failure to award punitive damages without cross appeal]; see also Puritan Leasing Co. v. August (1976) 16 Cal.3d 451, 463 [128 Cal.Rptr. 175, 546 P.2d 679]; Estate of Powell (2000) 83 Cal.App.4th 1434, 1439 [100 Cal.Rptr.2d 501].)
Even if Code of Civil Procedure section 906 authorizes this court to review plaintiff's contention, section 906 states only that the respondent may "request the reviewing court to and it may review" such contentions. (§ 906, italics added.) This language is clearly permissive, and does not require this court to consider plaintiff's contention. I do not believe this is an appropriate case for this court to exercise its discretion to consider plaintiff's contention. Rendering a ruling on the far reaching issue of federal preemption that contradicts existing authorities is unnecessary because this court has determined the Ordinance to be invalid under state preemption principles.

2. No Federal Preemption

In any event, the trial court correctly rejected plaintiff's claim of federal preemption.[5] The Ordinance does not affect the rights of employees to bargain collectively with employers, nor does it purport to regulate any conduct subject to regulation by the National Labor Relations Board (NLRB). Thus, preemption principles under San Diego Unions v. Garmon (1959) 359 U.S. 236 [3 L.Ed.2d 775, 79 S.Ct. 773] (Garmon) are not applicable.[6] (See Chamber of Commerce of United States v. Brown (2008) 554 U.S. ___, ___ *87 [171 L.Ed.2d 264, 128 S.Ct. 2408, 2412] (Brown); Fort Halifax Packing Co. v. Coyne (1987) 482 U.S. 1, 22, fn. 16 [96 L.Ed.2d 1, 107 S.Ct. 2211] (Fort Halifax).)
Likewise, the preemption doctrine set forth in Machinists v. Wisconsin Emp. Rel. Comm'n (1976) 427 U.S. 132 [49 L.Ed.2d 396, 96 S.Ct. 2548] (Machinists), does not apply, for the Ordinance protects union and nonunion workers alike, and does not otherwise regulate the economic weaponssuch as refusing to work overtime, employee picketing, or strikesused by parties in the processes of union organization, collective bargaining, or settling labor disputes. (See Brown, supra, 554 U.S. at p. ___ [128 S.Ct. at p. 2412]; Fort Halifax, supra, 482 U.S. at pp. 20-22; Metropolitan Life Ins. Co. v. Massachusetts (1985) 471 U.S. 724, 755 [85 L.Ed.2d 728, 105 S.Ct. 2380] (Metropolitan Life); see Southern California Edison Co. v. Public Utilities Com. (2006) 140 Cal.App.4th 1085, 1100-1101 [45 Cal.Rptr.3d 485].) State and local governments are entitled to provide certain protections for workers, so long as those protections do not impinge upon employee organization or the collective bargaining process. (Fort Halifax, supra, 482 U.S. at pp. 21-22 ["This argumentthat a State's establishment of minimum substantive labor standards undercuts collective bargainingwas considered and rejected in Metropolitan Life . . . ."].) The Supreme Court has not applied Machinists preemption outside of the bargaining context, to state laws designed to protect employees. (Metropolitan Life, supra, 471 U.S. at p. 754.) As one court has stated, "the Machinists doctrine carves an exception for state statutes of general application which deal with issues of fundamental state concern, such as health, safety, or welfare. This kind of legislation is permitted, because it is part of `the backdrop of state law that provided the basis of congressional action.' [Citation.] Preempting such legislation would `artificially create a no-law area.' [Citation.] The Supreme Court has noted that federal labor law `in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act.' [Citation.]" (Thunderbird Mining Co. v. Ventura (D. Minn. 2001) 138 F.Supp.2d 1193, 1198.) "It is axiomatic that a court `"cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States."' [Citation.]" (Ibid., quoting Metropolitan Life, supra, 471 U.S. at p. 757.)
Plaintiff argues that the Ordinance is preempted under Machinists, supra, 427 U.S. 132, because, under the federal "successor" or "successorship" doctrine, a new employer who hires the old employer's employees pursuant to the Ordinance will be required to bargain with the union representing those *88 employees, if there is one. But because the Ordinance requires retention of the prior employer's employees for only a 90-day transitional period and does not require the employer to provide the same wages or benefits as the previous business or the recognition of or bargaining with any union, the Ordinance should have no material effect on whether the new employer will be deemed by the NLRB to be the "successor" of the old employer for purposes of federal labor law.
The successorship doctrine was developed by the NLRB and approved by the United States Supreme Court as a means to determine whether, after a change in ownership or control of a business enterprise, a new employer is bound by the obligations of the old employer under federal labor law. (See, e.g., John Wiley & Sons v. Livingston (1964) 376 U.S. 543, 550-551 [11 L.Ed.2d 898, 84 S.Ct. 909] [whether successor had duty to arbitrate under predecessor's collective bargaining agreement]; NLRB v. Burns Security Services (1972) 406 U.S. 272, 277-281 [32 L.Ed.2d 61, 92 S.Ct. 1571] [successor's obligation under collective bargaining agreement and duty to bargain]; Golden State Bottling Co. v. NLRB (1973) 414 U.S. 168, 174-175 [38 L.Ed.2d 388, 94 S.Ct. 414] [whether successor was liable for predecessor's unfair labor practices]; Howard Johnson Co. v. Hotel Employees (1974) 417 U.S. 249, 263-264 [41 L.Ed.2d 46, 94 S.Ct. 2236] (Howard Johnson) [whether successor had duty in that case to arbitrate under predecessor's collective bargaining agreement]; Fall River Dyeing & Finishing Corp. v. NLRB (1987) 482 U.S. 27, 44 [96 L.Ed.2d 22, 107 S.Ct. 2225] (Fall River) [whether successor had duty to bargain with union representing predecessor's employees].) Importantly, "nothing in the federal labor laws `requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor . . ." (Howard Johnson, supra, 417 U.S. at p. 261)which is the subject of the Ordinance. The principles set forth by the United States Supreme Court in these cases involving successor employers focus on the NLRB's concern with the process of collective bargaining. (See NLRB v. Burns Security Services, supra, 406 U.S. at pp. 277-281 [based on circumstances of that case, successor employer was required to bargain with the incumbent union representing employees, but was not bound by the terms of the predecessor's collective bargaining agreement].) These cases do not concern the outcome of collective bargaining or prescribe specific terms of employment. (See McLeod, supra, 11 Hofstra L.J. at pp. 348-349.)
The determination whether an employer is a "successor" "is primarily factual in nature and is based upon the totality of the circumstances of a given situation . . . ." (Fall River, supra, 482 U.S. at p. 43.) As relevant here, "[a] finding of legal successorship is based upon a two-part inquiry. First, there must exist `substantial continuity' between the enterprises of the successor and the predecessor employers. [Citation.]" (Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd. (2d Cir. 2001) 247 F.3d 360, 365 *89 (Hoffman); see also Shares, Inc. v. N.L.R.B. (7th Cir. 2006) 433 F.3d 939, 943 (Shares) [inquiry into appropriate bargaining unit also required].) Whether there is "substantial continuity" is a "factual inquiry into the totality of the circumstances." (Hoffman, supra, 247 F.3d at p. 366.) "[T]he [NLRB] considers several factors: `whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.'" (Ibid., quoting Fall River, supra, 482 U.S. at p. 44.)
"Second, the successor must have hired a majority of the predecessor's employees at the time when the successor's workforce had reached a `substantial and representative complement.' [Citation.]" (Hoffman, supra, 247 F.3d at p. 365; see also Shares, supra, 433 F.3d at p. 943.) "In determining the presence of a substantial and representative complement, the [NLRB] will consider several factors: `whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production . . . [and] the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work . . . as well as the relative certainty of the employer's expected expansion.'" (Hoffman, supra, 247 F.3d at p. 366, quoting Fall River, supra, 482 U.S. at p. 49.) Determining whether and when the successor's workforce reached a substantial and representative complement is a question of fact to be determined by the NLRB. (Hoffman, supra, 247 F.3d at p. 367.)
Because application of the successorship doctrine requires consideration of the totality of the circumstances, it is incorrect to presume that the Ordinance will have anylet alone a determinativeeffect on the NLRB's successorship inquiry in any given case. The Ordinance requires a new employer only to retain employees for a 90-day transitional period, and to "consider" longer term employment if the employee's performance so warrants. Once the transitional period has passed, whether the successorship doctrine applies remains within the new employer's prerogative, because the new employer will control whether its employment and operational practices meet the requirements for it to be deemed a successor. (See Shares, supra, 433 F.3d at p. 943, italics added ["It is well established that a new employer has a duty to bargain when it makes a conscious decision to maintain generally the same business and to hire a majority of its employees from its predecessor."].) The Ordinance does not require employers to offer any employment beyond the transitional period, or to retain employees in the same position they previously held or to provide them with any particular wage or benefit. The Ordinance does not require the new owner to retain supervisory or managerial personnel at all, or to operate the grocery store in a similar manner or for the *90 same customer base as the prior owner. The Ordinance applies to union and nonunion employees alike, and permits the parties to opt out of its requirements by executing a collective bargaining agreement that so provides. (L.A.M.C., § 181.06.)
While the NLRB might consider an employer's compliance with the Ordinance as one factor in the successorship inquiry, there is no requirement that the NLRB give it any greater weight than any other factornor is it clear whether that factor would militate in favor of or against finding successorship. Accordingly, the Ordinance neither explicitly nor implicitly compels a new employer to bargain with any union, nor does it interfere with employees' right to organize. As a result, the Ordinance is not preempted under Machinists, supra, 427 U.S. 132.
The United States Court of Appeals for the District of Columbia Circuit in Washington Service Contractors Coalition v. District of Columbia (D.C.Cir. 1995) 311 U.S. App.D.C. 407 [54 F.3d 811] (Washington Service) employed similar reasoning in rejecting an argument essentially identical to plaintiff's. In that case, the District of Columbia adopted the District of Columbia Displaced Workers Protection Act (DWPA) that "require[d] that contractors who take over contracts for the provision of certain services [to the District of Columbia] must hire their predecessors' employees for a period of 90 days." (54 F.3d at p. 813.) As plaintiff argues here, the plaintiffs in Washington Service argued, inter alia, that "under certain circumstances the DWPA could require an employer to hire its predecessors' employees as a majority of its workforce, and that the employer would then be required to bargain with the union of its predecessors' employees under the NLRB's successorship doctrine. This, according to appellees . . ., would represent an `impermissib[l]e intrusion' on employers' collective bargaining rights, and the DWPA is therefore preempted under the Machinists preemption doctrine." (Id. at p. 816.)
The D.C. Circuit rejected that argument, explaining that it contained "a logical flaw": "Were a contractor to be required by the DWPA to retain its predecessors' union employees as a majority of its workforce, it is not at all clear whether the NLRB would oblige the new employer to bargain with the union of its predecessors' employees. . . . [T]he application of the successorship doctrine depends on the `totality of the circumstances'; where the employer has been required by local law to hire a majority of its predecessors' employees, the NLRB may or may not impose successorship obligations on the new employer. We will not know until the NLRB addresses the issue. At that time, if the NLRB determines that the successorship doctrine does not apply, appellees' alleged `conflict' will disappear. On the other hand, if the NLRBthe body to whom Congress has entrusted the evolution of federal *91 labor policy [citation]determines that the successorship doctrine should apply in such circumstances, it is difficult to see how appellees could argue that the result would invoke `conflict' between the DWPA and the NLRA. Such a ruling by the NLRB would presumably represent the Board's judgment that enforcing its successorship requirement in the context of DWPA hires would be congruent with the aims of the NLRA." (Washington Service, supra, 54 F.3d at pp. 816-817; see Alcantra v. Allied Properties, LLC (E.D.N.Y. 2004) 334 F.Supp.2d 336, 339, 344 [New York City ordinance requiring purchasers of large buildings to retain service employees of seller for 90 days not preempted by NLRA]; Rosen et al., Cal. Practice Guide: Federal Employment Litigation (The Rutter Group 2009) § 10:1199, pp. 10-101 to 10-102 ["The NLRA does not preempt state laws protecting displaced workers (e.g., from being terminated within a specified time after a business is sold). Such laws have nothing to do with the rights to organize or bargain collectively."]; see also Southern California Edison Co. v. Public Utilities Com., supra, 140 Cal.App.4th at pp. 1100-1101.)
The reasoning and conclusion in Washington Service, supra, 54 F.3d 811, are persuasive. The Ordinance does not mandate or otherwise induce, either directly or indirectly, a successor employer to bargain with any union, adopt the predecessor's collective bargaining agreement, compel the employer to set any specific wages and benefits, interfere with any bargaining, or intervene in any employer relations with any union. As noted, whether a successor employer is required to bargain with a union under the successorship doctrine is left to be determined by the NLRB on a case-by-case basis, in light of the totality of the circumstances. (Fall River, supra, 482 U.S. at p. 43.) There are no facts here concerning any predecessor employer or successor entity or applicable collective bargaining agreement. Plaintiff has raised the issue in the abstract.
The concept of "`the free play of economic forces'" referred to in Machinists, supra, 427 U.S. at page 140, has no applicability here. The Ordinance does not "directly" regulate "any economic activity of either of the parties" or seek "directly to force a party to forgo the use of one of its economic weapons" (Fort Halifax, supra, 482 U.S. at p. 20), or otherwise regulate the parties' "methods of putting economic pressure upon one another. . ." (Machinists, supra, 427 U.S. at p. 154).
The United States Supreme Court's holding in Brown, supra, 554 U.S. ___ [128 S.Ct. 2408], does not support plaintiff's position. In that case, the court held that the NLRA preempted California statutes that prohibited employers from using funds received from the state to "`assist, promote, or deter union organizing.'" (554 U.S. at p. ___ [128 S.Ct. at p. 2411].) The court held the statutes "impose[d] a targeted negative restriction on employer speech about *92 unionization" (id. at p. ___ [128 S.Ct. at p. 2415]), in direct conflict with "[t]he explicit direction from Congress to leave noncocercive speech unregulated" in section 8(c) of the NLRA (554 U.S. at pp. ___-___ [128 S.Ct. at pp. 2413-2414]). The Ordinance at issue in this case does not regulate employer speech or otherwise bear any resemblance to the statutes at issue in Brown, nor did the court in Brown discuss or citelet alone overruleWashington Service, supra, 54 F.3d 811.
For all the reasons I have discussed, I would reverse the judgment.
NOTES
[1] Effective July 1, 2007, the Legislature repealed the California Uniform Retail Food Facilities Law and replaced it with the CRFC. There are no substantive differences, however, as to the provisions at issue in this case. All further statutory references are to the current provisions of the Health and Safety Code, unless otherwise stated.
[2] We note that a statute or ordinance avoids preemption by specifically exempting employers who are subject to the NLRA. (See, e.g., Lab. Code, § 1127, subd. (c) [statute making collective bargaining agreements binding against successor employers does not apply to any employer subject to the NLRA].)
[1] Adopted by the Los Angeles City Council, the Ordinance took effect on February 13, 2006.
[2] Similar laws apply to grocery workers in other cities (see, e.g., S.F. Police Code, art. 33D; Gardena Mun. Code, ch. 5.10; Santa Monica Mun. Code, ch. 5.40) as well as to workers in other industries (see, e.g., L.A.M.C., § 183.00 et seq.; Berkeley Mun. Code, ch. 13.25; Reich, Living Wage Ordinances in California (2003) The State of California Labor, 2003, pp. 199, 203, fn. 4 ["A number of ordinances also contain conditions on worker retention ...."]). It has been said, "American law does almost nothing to protect workers when businesses change hands." (McLeod, Rekindling Labor Law Successorship in an Era of Decline (1994) 11 Hofstra Lab. L.J. 271 (McLeod).) Displacement laws deal with perceived abuses of workers. (See Hiatt, Policy Issues Concerning the Contingent Work Force (1995) 52 Wash. & Lee. L.Rev. 739, 748-749; see also Exec. Order 13495, 74 Fed.Reg. 6103 (Jan. 30, 2009).)
[3] Statutory references are to the Health and Safety Code unless stated otherwise.
[4] The preamble to the Ordinance is not even conclusive as to the purpose of the Ordinance. (See Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal.4th 1106, 1118 [81 Cal.Rptr.2d 471, 969 P.2d 564] ["legislative intent is not gleaned solely from the preamble of a statute; it is gleaned from the statute as a whole . . ."]; see also State Farm Mutual Automobile Ins. Co. v. Garamendi (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71].)
[5] The Supreme Court, in connection with federal labor preemption of state law, "particularly in the period since 1980 . . . has with increasing frequency sustained state law. . . ." (Cox et al., Labor Law, Cases and Materials (14th ed. 2006) p. 1004.)
[6] Labor Code section 1127, subdivision (a), which provides that a successor clause in a collective bargaining agreement "shall be binding upon and enforceable against any successor employer," is the sort of provision that might be preempted under Garmon, supra, 359 U.S. 236, but for its express exclusion of "any employer who is subject to the [NLRA]." (Lab. Code, § 1127, subd. (c); see United Steelworkers v. St. Gabriel's Hosp. (D.Minn. 1994) 871 F.Supp. 335, 338, fn. 3.) The Ordinance needs no such blanket exclusion because, as discussed, it is not preempted. Any such exclusion would render the Ordinance largely ineffectual.